306 Ga. 127
FINAL COPY

S19A0118. BROXTON v. THE STATE.
S19A0119. PENA v. THE STATE.

ELLINGTON, Justice.

Following a jury trial, appellant Joseph D. Broxton was convicted of the malice murder of Edward Chadmon, Oliver Campbell, and Rocqwell Nelson; the aggravated assault of Deion Harden, Falana Coley, and Jordan Turner; criminal attempt to commit armed robbery; and seven counts of violation of the Street Gang Terrorism and Prevention Act (the "Street Gang Act"). Broxton's co-defendant, appellant Daniel Luis Pena, was convicted of the malice murder of Chadmon and Nelson; the aggravated assault of Coley and Turner; criminal attempt to commit armed robbery; and five counts of violation of the Street Gang Act.[1] On

---

[1] Chadmon was killed on July 3, 2015. Campbell and Nelson were killed on July 30, 2015. On September 8, 2015, a DeKalb County grand jury charged Broxton, Pena, and seven others in a 45-count indictment. Broxton was

charged in Counts 1-4, 11-20, and 22-33. Counts 1-4 were later nolle prossed. Pena was charged in Counts 11-18 and 26-33.

Counts 11-18 were based on acts committed in DeKalb County on July 3, 2015. In Counts 11 and 12, Broxton and Pena were charged with criminal attempt to commit armed robbery by driving to the Stone Mountain Inn with firearms and with their co-conspirators with the intent to commit theft, and violation of the Street Gang Act for participation in criminal gang activity through commission of that crime. In Counts 13-16, Broxton and Pena were charged with the malice murder, felony murder, and aggravated assault of Chadmon, and violation of the Street Gang Act for participation in criminal gang activity through the commission of those crimes. In Counts 17 and 18, Broxton and Pena were charged with the aggravated assault of Darius Wilder and violation of the Street Gang Act for participation in criminal gang activity through the commission of that offense.

Counts 19, 20 and 22-33 were based on acts committed in DeKalb County on July 30, 2015. In Counts 19 and 20, Broxton was charged with the aggravated assault of Harden and violation of the Street Gang Act for participation in criminal gang activity through commission of that offense. In Counts 22-25, Broxton was charged with the malice murder, felony murder, and aggravated assault of Campbell and violation of the Street Gang Act for participation in criminal gang activity through the commission of those crimes. In Counts 26 and 27, Broxton and Pena were charged with the aggravated assault of Coley and violation of the Street Gang Act for participation in criminal gang activity through the commission of that crime. In Counts 28-31, Broxton and Pena were charged with the malice murder, felony murder, and aggravated assault of Nelson and violation of the Street Gang Act for participation in criminal gang activity through the commission of those offenses. In Counts 32 and 33, Broxton and Pena were charged with the aggravated assault of Turner and violation of the Street Gang Act for participation in criminal gang activity through the commission of that crime.

Broxton and Pena were tried before a jury on March 28-April 6, 2017. The jury found Broxton guilty of Counts 11-16, 19-20, and 22-33, and not guilty of Counts 17 and 18. The jury found Pena guilty of Counts 11-16, and 26-33, and not guilty of Counts 17 and 18. On June 22, 2017, Broxton was ordered to serve three consecutive sentences of life in prison without parole and an additional 60 years in confinement. Also on June 22, 2017, Pena was ordered to serve two consecutive sentences of life in prison without parole and an additional 40 years in confinement.

appeal, Broxton contends (1) his trial counsel was ineffective and (2) the trial court erred in allowing the written statement of a co-indictee to go back into the jury room. Pena contends (1) the trial court erred in denying his motion for a directed verdict on Counts 27-33, and (2) his trial counsel was ineffective. We affirm for the reasons set forth below.

1. This case concerns multiple crimes committed by Broxton, Pena, and their co-indictees in July 2015. Viewed in a light most favorable to the verdicts, the evidence presented at trial shows the following. Broxton and Pena are members of a criminal street gang known as the "Gangster Disciples," as well as an associated criminal street gang known as the "Hate Committee." On or before July 30, 2015, Hate Committee members received word from their leadership

On June 23, 2017, Broxton filed a motion for a new trial, which he amended on April 9, 2018; the motion was denied on June 27, 2018. Pena filed a premature motion for new trial on April 6, 2017, which became effective upon entry of judgment, see *Southall v. State*, 300 Ga. 462, 465 (1) (796 SE2d 261) (2017), a second motion for new trial on July 6, 2017, and an amendment to the motion for new trial on March 20, 2018. The motion was denied on June 27, 2018. Broxton and Pena filed timely notices of appeal, and the appeals were docketed in this Court for the term beginning in December 2018, submitted for decision on the briefs, and consolidated for opinion.

3

that certain persons had been "green-lit," which meant that they were subject to being beaten or killed. Multiple shootings then occurred on July 30, 2015, including the shootings that resulted in the deaths of Campbell and Nelson. Chadmon was killed in a separate incident on July 3, 2015.

More specifically, during the early morning of July 3, 2015, approximately 15 armed men, including Broxton, Pena, Rodricous Gresham, Quantavious Hurt, and Karim Ficklin, drove in several cars to the Stone Mountain Inn in DeKalb County for the purpose of committing robbery. Upon arriving, they saw that the police were there, and so they left. Broxton, Pena, Gresham, and Ficklin returned to the Stone Mountain Inn later that morning, and they went to a room where drugs were being sold. Ficklin testified at trial that "Fat," identified by other testimony as Anthony Caldwell, rode with them.

Chadmon, who was holding a gun, was one of several people in the room. After an argument among those present, Pena and Chadmon began to struggle for possession of Chadmon's weapon.

4

Ficklin saw Caldwell shoot Chadmon in the leg and Pena gain control of Chadmon's gun, after which Ficklin ran out of the room and heard another gunshot. Pena later told Hurt that Caldwell shot Chadmon in the leg, after which Pena grabbed Chadmon's gun and used it to shoot Chadmon. The bullet entered Chadmon's right upper back and severed a large artery under the collar bone, causing his death.

At approximately 2:00 a.m. on July 30, 2015, Deion Harden was walking home through a DeKalb County apartment complex when a white car pulled up. He was shot five times, after which the car drove off. Harden survived. At trial, Hurt testified that he saw Broxton shoot Harden. Harden denied knowing who shot him, and he denied telling his stepfather who shot him. Harden's stepfather, however, testified that he had asked Harden who shot him, and Harden answered that it was "Joe." Based on phone records and his independent investigation, a DeKalb County district attorney investigator testified that at 1:55 a.m. on July 30, 2015, Broxton's

5

cell phone was communicating with a cell tower 2.1 miles away from the location where Harden was shot.

Around 6:30 a.m. on July 30, 2015, a DeKalb County police officer responded to a call of "shots fired" at the Valero gas station on Candler Road. The officer found Campbell in the driver's seat of a pickup truck, slumped over and unresponsive. Campbell's autopsy showed that he had been shot in his left hand, chest, and neck. At trial, Ficklin testified that Broxton never told him that Broxton killed anyone at the Valero, but Ficklin then acknowledged that he previously informed the police that Broxton told him Broxton "shot somebody at the Valero." Hurt testified that Broxton told him that Broxton shot Campbell. The DeKalb County district attorney investigator testified that Broxton's cell phone was communicating with a cell tower located 1.1 miles from the location of the Valero shooting at 6:27 a.m. and 6:29 a.m. on July 30, 2015.

Also on July 30, 2015, at approximately 7:00 p.m., Coley went to visit her sister at the Windview Apartments on Central Drive in DeKalb County. She saw a dark blue BMW pull up to four men

standing around a Camaro. Shortly after the BMW drove out of Coley's line of sight, she heard gunshots. After Coley ran inside, she realized that she had been shot in the thigh.

At trial, the prosecutor asked Ficklin to tell the jury what happened when Coley got shot. Ficklin said that he, Broxton, Pena, and Hurt were driving in a dark blue BMW when they pulled past a group of people they believed to be members of the Bloods gang. They drove past the group to the back of the apartment complex, turned around, jumped out of the car, and began shooting. Ficklin testified that only he and Hurt got out of the car, but he also acknowledged that he had said previously that it was Broxton, Pena, and Hurt who jumped out of the car and began shooting. Hurt testified that he, Broxton, Pena, and Ficklin had been driving in a BMW on Central Drive "looking for trouble," when they saw individuals associated with the Bloods gang. According to Hurt, they turned around, and Broxton, Pena, and Ficklin got out of the car and shot at the suspected gang members, who "took off running."

After the Coley shooting, the four men continued to drive around looking, as acknowledged by Ficklin, for "somebody to shoot." They spotted Nelson and Turner standing on a porch at a DeKalb County apartment complex. Broxton and Hurt got out of the car, approached the two, and began firing at close range. Nelson, who died at the scene, was shot in the face and sustained multiple gunshot wounds to the chest, and Turner, who "balled up" on the ground, sustained numerous gunshot wounds to her legs but survived.

On July 31, 2015, a DeKalb County police officer received an alert concerning a stolen blue BMW. The officer located the BMW at an Economy Inn near I-20. Broxton later acknowledged in a police interview that he had seen the BMW parked at the motel where he had been staying, and he then admitted that he had driven the BMW and that Ficklin was with him at the time. A crime scene investigator found a "Liberty" brand 9-millimeter shell casing on the driver's side floor of the BMW.

During the course of a manhunt on the evening of July 31, 2015, Broxton was apprehended while riding as a passenger in a friend's car stopped at a Checkers parking lot. A Glock .40-caliber handgun was found under the car's front passenger's seat. The car's driver testified that the Glock did not belong to him.

Broxton's cell phone was seized during his arrest. The phone contained a record of outgoing text messages stating "they locking me up," and that his "strap," which a detective testified referred to a gun, was under the seat. The phone also contained a record of Internet searches for "breaking news Atlanta shooting," "Candler Road shooting 2015," and "shooting at Valero gas station." On July 31, 2015, the phone had accessed websites referencing "DeKalb police investigate shooting on Candler Road," and "One killed in double shooting in DeKalb County Apartment."

During trial, the State presented testimony of a GBI firearms and ballistics expert. He testified that the Glock .40-caliber handgun found when Broxton was arrested was a match for shell casings found at the scenes of the Campbell and Coley shootings. He

9

determined that certain other cartridge casings found at the scenes of the Harden, Coley, and Nelson and Turner shootings were fired from the same firearm, which was a weapon consistent with a Glock 9-millimeter pistol. The witness also testified that "Liberty" ammunition is relatively uncommon, and that "Liberty Civil Defense" projectiles were taken from Nelson's body. Liberty shell casings were also located at the scenes of the Coley shooting and the Nelson and Turner shooting.

During the trial, the State presented evidence of Broxton's and Pena's association with the Gangster Disciples and the Hate Committee. An expert on street gang identification testified that the Gangster Disciples is "one of the most organized gangs in the country," and that the Hate Committee acts as enforcers for the Gangster Disciples. The witness explained that the numbers "360" and "720" have significance to the Gangster Disciples in that they represent "degrees of knowledge" concerning the organization. The six-point star also has meaning for the Gangster Disciples, the witness testified, and may be understood as showing gang

10

membership when worn as jewelry or in the form of a tattoo. Evidence showed that Broxton has multiple tattoos: a "720," with a six-point star in place of the "0," near one ear; "Hate" by the other ear; and several six-point stars on his left forearm. Pena has "Hate" tattooed on his hand.

Gresham testified that he was a member of the Hate Committee and that some Hate Committee members have the word "Hate" tattooed on their body. Ficklin testified that he was a member of the Gangster Disciples, and that Broxton, Pena, and Gresham have "Hate" tattooed on their bodies, signifying their membership in the Hate Committee. Hurt testified that he, Broxton, and Pena were members of the Gangster Disciples and of the Hate Committee.

Ficklin testified that, concerning events on the evening of July 30, 2015, "Smurf," identified in other testimony as Ronald Glass, a leader of the Hate Committee and a member of the Gangster Disciples, had told him about "folks getting the green light . . . around Central." According to Ficklin, persons who have gotten the green light are subject to being beaten or killed. Hurt testified that,

11

at the time of the Harden shooting, the area where Harden was located had been "green-lit."[2] Ficklin testified that, in reference to the Coley and the Nelson and Turner shootings, he, Broxton, Pena, and Hurt had been driving around looking to find persons who had been "green-lit," and then shoot them.

After the presentation of the State's evidence, the trial court informed the jury that the parties had stipulated that both defendants were associates and/or members of the Hate Committee; that the Hate Committee is a criminal street gang; and "that there is a nexus between crimes committed and the furtherance of the interests of the criminal gang." Broxton then testified in his defense. Pena chose not to testify.

The evidence presented at trial, as summarized above and as further discussed in Division 4, infra, was sufficient to authorize the jury to find Broxton and Pena guilty of the crimes for which they

---

[2] It appeared from Hurt's testimony that the green light in this instance was not issued with respect to named individuals, but with respect to those persons who were both associated with certain criminal gangs and physically within the Stone Mountain area.

were convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

*Case No. S19A0118*

2. Broxton contends that his trial counsel was ineffective in stipulating that elements of the Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq., had been met. To establish ineffective assistance, a defendant must show both that his counsel's performance was professionally deficient and that, but for counsel's unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. See *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). If an appellant fails to carry his burden on one prong of the two-prong test, we need not review the other prong. See *Matthews v. State*, 301 Ga. 286, 288-289 (2) (800 SE2d 533) (2017).

To establish that his trial counsel's performance was professionally deficient, a defendant must demonstrate that his attorney performed "in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional

13

norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013) (citation and punctuation omitted); see also *Strickland*, 466 U. S. at 687-688. This requires a defendant to "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Marshall v. State*, 297 Ga. 445, 448 (2) (774 SE2d 675) (2015) (citation and punctuation omitted). "In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Davis v. State*, 299 Ga. 180, 183 (2) (787 SE2d 221) (2016) (citation and punctuation omitted). When reviewing an ineffective assistance of counsel claim, we accept the trial court's factual findings and determinations of credibility unless clearly erroneous, but independently apply legal principles to the facts. See *Perdue v. State*, 298 Ga. 841, 845 (3) (785 SE2d 291) (2016).

With these principles in mind, we turn to Broxton's claim of ineffective assistance of trial counsel. After the presentation of the State's evidence, the trial court informed the jury:

> The State and the defense have stipulated and agreed that both defendants are associates and/or members of the Hate Committee. Likewise, they also stipulate that the Hate Committee is a criminal street gang and that there is a nexus between crimes committed and the furtherance of the interests of the criminal gang.

The trial court then directed the jury that, "when determining the guilt or innocence of each defendant as to Counts 12, 16, 18, 20, 25, 27, 31, and 33, . . . the only remaining issue is the State must prove to you beyond a reasonable doubt whether each defendant is guilty of the predicate acts." The specified counts alleged violations of OCGA § 16-15-4 of the Street Gang Act.[3]

As relevant here, to establish a violation of the Street Gang Act, the State must show the existence of a criminal street gang;[4]

---

[3] OCGA § 16-15-4 (a) provides: "It shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3."

[4] See OCGA § 16-15-3 (2).

15

the accused's employment by or association with that gang; the accused's commission of an act of criminal gang activity;[5] and "that the commission of the predicate act was intended to further the interests of the gang." *Stripling v. State*, 304 Ga. 131, 134 (1) (b) (816 SE2d 663) (2018) (citation and punctuation omitted). See *McGruder v. State*, 303 Ga. 588, 591-592 (II) (814 SE2d 293) (2018). In other words, "there must be some nexus between the [predicate] act and an intent to further street gang activity." *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009). Broxton argues that the evidence did not show that any crime committed by Broxton at the Stone Mountain Inn was intended to further gang interests, and so his trial counsel was deficient in stipulating that this required element had been met, and he was necessarily prejudiced thereby.

Broxton's trial counsel did not testify at the motion for new trial hearing. We presume that trial counsel's decision to enter into the stipulation was a matter of strategy and trial tactics;

---

[5] "[C]riminal gang activity" includes "[a]ny criminal offense in the State of Georgia . . . that involves violence, possession of a weapon, or use of a weapon." OCGA § 16-15-3 (1) (J).

16

consequently, the question of whether counsel was professionally deficient turns upon whether Broxton has shown that no competent attorney would have entered into the stipulation. See *Brown v. State*, 288 Ga. 902, 909 (5) (708 SE2d 294) (2011).

Broxton readily acknowledged during his direct testimony that he was a member of both the Hate Committee and Gangster Disciples. However, Broxton explained, he made his money by selling drugs and by credit card fraud. Broxton also testified that, after exiting a nightclub in the early morning of May 25, 2015, he was shot four times. According to Broxton, he was released from the hospital in late June or early July 2015, and he was required to carry a colostomy bag due to having been shot in the lower stomach. He then proceeded, in his direct testimony, to deny his participation in the crimes for which he had been indicted, all of which occurred within a month of his release from the hospital after suffering serious injury.

As to the events at the Stone Mountain Inn, Broxton testified that the first trip to the inn was for the purpose of obtaining drugs

for a third party, and that he had no knowledge of a planned robbery. Broxton came back to the inn, he testified, after calling an acquaintance there and confirming that the acquaintance had some "weed." Broxton maintained that, when he got to the room at the inn, he went outside to the patio with a woman, and that he did not see the shooting.

Broxton's testimony, as guided by his trial counsel on direct, showed that his theory of defense was that, although he was a gang member, he did not commit any of the charged crimes, including those predicate to the Street Gang Act charges. Consistent with this defense, the stipulation made it clear that the State was required to prove that Broxton was guilty of the predicate acts beyond a reasonable doubt.

By the time the stipulation was read to the jury, the State had presented overwhelming evidence that Broxton was a member of the Hate Committee. The State had also come forward with evidence that the Hate Committee was a criminal street gang and that the commission of the predicate acts was intended to further the

interests of the Hate Committee. As to those interests, the evidence showed that the Hate Committee acted as enforcers for the Gangster Disciples. As explained by expert testimony, the Hate Committee's role was to take care of issues for the Gangster Disciples, whether those issues arose from an outside gang or within the Gangster Disciples. Testimony showed that Chadmon was killed following an argument sparked when the Hate Committee members, after arriving at the room at the Stone Mountain Inn where Chadmon was located, accused those present of not being authentic members of the Gangster Disciples. The evidence also implicated the Hate Committee's leadership in directing or authorizing the multiple shootings that occurred on July 30, 2015.

Notwithstanding the stipulation to certain elements of the Street Gang Act charges, Broxton's testimony, if believed by the jury, provided a defense to those charges because he denied committing the predicate acts. A competent attorney could conclude that Broxton's honesty in acknowledging through his testimony and the stipulation that he was a gang member would bolster his

19

credibility. A competent attorney could also conclude that asking the jury to parse through the Hate Committee's interest in crimes Broxton testified he did not commit would not improve, and might impair, the likelihood of his acquittal, and that the stipulation would relieve the jury from possible confusion in concentrating on issues that were not relevant to Broxton's theory of defense.

Broxton's stipulation was therefore "a valid trial strategy[,] and reasonable trial strategy does not constitute deficient performance." *Pruitt v. State*, 282 Ga. 30, 35 (4) (e) (644 SE2d 837) (2007) (citations omitted). See *United States v. Monghan*, 409 Fed. Appx. 872, 878 (III) (B) (6th Cir. 2001) (factual stipulations to elements of a crime are often the product of a sound trial strategy, and defendant had nothing to gain by challenging obvious issues and "perhaps had much to lose by adding unnecessary complexity and time to the trial"); *Barlow v. United States*, 2014 U. S. Dist. LEXIS 48483 (III) (B) (E.D. N.Y. Apr. 8, 2014) (strategy of counsel in stipulating to an element of the charged crime and focusing the defense on attacking the evidence supporting another element was

sound and objectively reasonable). Accordingly, Broxton has not shown that his trial counsel was deficient as alleged.

3. Broxton claims that the trial court erred in allowing Ficklin's written statement to the police to go back into the jury room in violation of the continuing witness rule. See, e.g., *Rainwater v. State*, 300 Ga. 800, 803 (2) (797 SE2d 889) (2017) ("[I]t is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once.") (citation and punctuation omitted). The record shows that, during the course of their deliberations, the jury sent a note to the trial court asking for, among other things, a copy of Ficklin's written statement. After discussion among defendants' counsel and the trial court, and with the express agreement of Broxton's counsel, the prosecutor read the statement to the jury in open court. Broxton does not show by reference to the record that Ficklin's written statement was, at any time, sent to the jury room, and he does not complain about the reading of the statement to the

21

jury in the courtroom. It follows that there is no merit to the error asserted.

## Case No. S19A0119

4. Pena contends that the evidence was not sufficient to support his convictions for the crimes arising out of the shooting of Nelson and Turner, and that the trial court therefore erred in denying his motion for directed verdict of acquittal for the malice murder of Nelson (Count 28), the aggravated assault of Turner (Count 32), and the two counts of violation of the Street Gang Act predicated on those offenses (Counts 31 and 33).[6] "The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Smith v. State*, 304 Ga. 752, 754 (822 SE2d

---

[6] At the conclusion of the State's case-in-chief, Pena's counsel moved for a directed verdict of acquittal on Counts 27-33. Pena does not argue that the trial court erred in denying the motion for acquittal as to Count 27, which charged violation of the Street Gang Act arising out of the Coley shooting. Pena was not sentenced for Count 29, felony murder of Nelson, nor Count 30, aggravated assault of Nelson, and, to the extent he argues that the evidence was insufficient as to those counts, the claims are moot. See, e.g., *Mills v. State*, 287 Ga. 828, 830 (2) (700 SE2d 544) (2010) (where felony murder conviction was vacated by operation of law, claim of insufficient evidence to support that conviction was moot).

220) (2018) (citation and punctuation omitted). See *Jackson*, 443 U. S. at 319 (III) (B).

The evidence does not show that Pena drove the BMW, that he shot either Nelson or Turner, or that he exited the car when it stopped at the scene. However, "[e]very person concerned in the commission of a crime is a party thereto and may be . . . convicted of commission of the crime." OCGA § 16-2-20 (a). As applicable here, and as the jury was instructed in substance, a person is a party to the crime if that person "[d]irectly commits the crime; . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime." OCGA § 16-2-20 (b).

Mere presence at the scene of the crime is not sufficient evidence to convict a defendant of being a party thereto; however, the jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with the other perpetrators before, during and after the offense. See *Butts v. State*, 297 Ga. 766, 770 (2) (778 SE2d 205) (2015); *Navarrete v. State*, 283 Ga. 156, 158

(1) (656 SE2d 814) (2008). Here, evidence showed that on the evening of July 30, 2015, Pena, Broxton, Ficklin, and Hurt were seeking to shoot persons who had been "green-lit" by the Gangster Disciples. Hurt testified that, during the incident that led to Coley's injury, Pena was one of the gunmen who fired at suspected members of another gang. Pena remained in the company of his fellow gang members when, shortly thereafter, their car stopped at the scene of the Nelson and Turner shooting, after which the four of them left together.

Given the evidence that the four companions were acting together to seek out and shoot persons who had been "green-lit," Pena's participation in the Coley incident, his presence at the scene of the Nelson and Turner shooting, and his flight from that scene, the jury could conclude that Pena shared in the criminal intent of the actual shooters. See *Eckman v. State*, 274 Ga. 63, 65 (1) (548 SE2d 310) (2001) (evidence showing that appellant shared in the criminal intent included that she was willingly present at the scene when the victims were killed and had been involved in her

24

companions' commission of crimes in the previous 24 hours); *Garcia v. State*, 290 Ga. App. 164, 165 (2) (658 SE2d 904) (2008) (where appellant and other gang members went to a rival gang member's apartment with the intent of starting a fight, appellant was present when his fellow gang member shot into the apartment, injuring three of the rival gang member's relatives, and appellant fled the scene afterward, the evidence was sufficient to show that appellant was a party to the crimes of aggravated assault arising from that incident). The evidence was sufficient to authorize Pena's conviction as a party to the malice murder of Nelson and the aggravated assault of Turner, as well as the counts of violation of the Street Gang Act predicated on those crimes, and consequently the trial court did not err in denying Pena's motion for a directed verdict of acquittal. See, e.g., *Mangum v. State*, 274 Ga. 573, 574 (1) (555 SE2d 451) (2001) (as evidence was sufficient for the jury to find appellant guilty beyond a reasonable doubt of the crimes for which he was convicted, it followed that the trial court did not err in denying his motion for a directed verdict of acquittal).

25

5. Lastly, we address Pena's claim that he received ineffective assistance of trial counsel in that his counsel (a) failed to file a pre-trial motion for immunity based on a claim of self-defense and (b) failed to move to sever his trial from that of Broxton.

(a) Pena contends that his trial counsel was ineffective in failing to file a pre-trial motion seeking immunity from prosecution based on self-defense. See OCGA § 16-3-24.2.[7] At the hearing on his motion for a new trial, Pena's trial counsel testified that, during their pre-trial discussions, Pena maintained that he had acted in self-defense during the shooting at the Stone Mountain Inn. Trial counsel acknowledged that he did not file a pre-trial immunity motion on Pena's behalf. Pena's new counsel did not ask trial counsel why he did not file the motion.

---

[7] OCGA § 16-3-24.2 provides:

A person who uses threats or force in accordance with Code Section 16-3-21, 16-3-23, 16-3-23.1, or 16-3-24 shall be immune from criminal prosecution therefor unless in the use of deadly force, such person utilizes a weapon the carrying or possession of which is unlawful by such person under Part 2 of Article 4 of Chapter 11 of this title.

26

"[C]ounsel's actions are presumed strategic." *Holmes v. State*, 273 Ga. 644, 648 (5) (c) (543 SE2d 688) (2001) (citation and punctuation omitted). It may be reasonable for trial counsel to forgo a pre-trial immunity motion so as to avoid subjecting his client to pre-trial cross-examination, or for counsel to elect to demonstrate self-defense to the jury, rather than to the judge. See *Dent v. State*, 303 Ga. 110, 119 (4) (d) (810 SE2d 527) (2018). As trial counsel's decision to forgo a pre-trial immunity motion is presumed strategic, and Pena has not established that no competent attorney would have failed to file the motion under the circumstances of this case, he has not shown that his counsel's performance was professionally deficient.

(b) Pena also contends that his trial counsel was ineffective in that he failed to file a motion to sever his trial from that of Broxton. Trial counsel testified at the motion for new trial hearing that he did not file a motion to sever because he had assessed that there was no legal basis for doing so.

Pena argues that his trial counsel's failure to move to sever was unreasonable because the motion, if filed, would have been granted under the standard set forth in *Satterfield v. State*, 256 Ga. 593, 596-597 (3) (351 SE2d 625) (1987), and because he was strongly prejudiced by the failure to sever. As this Court said in *Satterfield*:

> The question of severance of the trial of defendants for a capital felony where the death penalty has been waived is within the discretion of the trial court. Factors which should be considered in exercising that discretion are (1) whether the number of defendants will create confusion; (2) whether there is danger that evidence against one defendant will be considered against another by the jury despite instructions from the court; [and] (3) whether the defenses of one defendant are antagonistic to defenses of another.

Id. at 596 (3) (citation omitted). Pena does not argue that the first two factors weighed in favor of severance, but asserts that Broxton's "other narrative" led to an unfair trial. Although Broxton chose to testify, he maintained that he was standing outside the room when Chadmon was shot at the Stone Mountain Inn, and that he was not present during the Coley shooting or the Nelson and Turner shooting. Broxton's defenses were not antagonistic to the defenses identified by Pena, particularly self-defense in the case of his actions

28

at the Stone Mountain Inn and the State's alleged failure to show that he was a party to the shooting of Nelson and Turner. See *Styles v. State*, 279 Ga. 134, 135-136 (2) (610 SE2d 23) (2005) (the two co-defendants' defenses were not antagonistic when they both denied involvement in the crimes); *Hayes v. State*, 261 Ga. 439, 442 (3) (405 SE2d 660) (1991) (the two co-defendants' theories of defense were different, with one claiming that he was attempting to lawfully arrest the victim and the other contending that he did not shoot at the victim, but those defenses were not antagonistic), disapproved on other grounds, *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018).

Furthermore, to require severance, the moving defendant must "do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process." *Lupoe v. State*, 300 Ga. 233, 242 (2) (c) (794 SE2d 67) (2016) (citation and punctuation omitted). To the extent that Pena contends he was prejudiced by having to sit next to Broxton, who

29

was an admitted drug dealer and gun owner, during the trial and by having his right to remain silent diminished by Broxton's decision to testify, this is no more than speculation. "[I]f trial counsel had filed a motion to sever, the trial court would not have abused its discretion in denying it." Id. Pena does not show that his counsel was professionally deficient in failing to move to sever Pena's trial from that of Broxton.

*Judgments affirmed. All the Justices concur.*

Decided June 10, 2019.

Murder. DeKalb Superior Court. Before Judge Coursey.

The Moore Brown Law Group, Angela Z. Brown, for appellant (case no. S19A0118).

Manning Peace, Holly Y. Peace, for appellant (case no. S19A0119).

Sherry Boston, District Attorney, Lenny I. Krick, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.